FILED
IN CLERKS OFFICE

2005 FEB 28  P 1: 56

U.S. DISTRICT COURT
DISTRICT OF MASS
CASE NO. 04-11637-RGS

VINCENT  GODWIN,

      PETITIONER

    V

JAMES DIPALO,

      RESPONDENT

SCANNED

DATE: ___3/2/05___

BY: _____k.S_____


## LEGAL BRIEF

THIS LEGAL BRIEF WAS PREPARED BY THOMAS FOLEY, THE COURT-APPOINTED COUNSEL FOR MY APPEAL IN THE MASSACHUSETTS SUPREME JUDICIAL COURT.

I REQUEST THIS HONORABLE COURT TO REVIEW AND ACCEPT THIS AS MY BRIEF IN THE ABOVE-REFERENCED CASE.


FEB. 23, 2005
_____DATE_____

_____
VINCENT GODWIN
PETITIONER

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

MIDDLESEX COUNTY                                      SITTING

NO. 02-P-1106

---

COMMONWEALTH OF MASSACHUSETTS,

APPELLEE

v.

VINCENT GODWIN,

APPELLANT.

---

ON APPEAL FROM JUDGMENTS OF THE SUPERIOR COURT

---

BRIEF AND RECORD APPENDIX
FOR THE DEFENDANT

---

Thomas C. Foley
Attorney at Law
P. O. Box 2187
South Hamilton, MA 01982
(978) 921-0217
BBO No. 631661

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

MIDDLESEX COUNTY                                    2002 SITTING

NO. 02-P-1106

_____

COMMONWEALTH OF MASSACHUSETTS,

APPELLEE

V.

VINCENT GODWIN,

APPELLANT.

_____

ON APPEAL FROM JUDGMENTS OF THE SUPERIOR COURT

BRIEF AND RECORD APPENDIX
FOR THE DEFENDANT

## ISSUES PRESENTED

1.   Where the record reveals that the defendant was indigent and had repeatedly requested appointed counsel, did the hearing judge's unsupported determination that the defendant was not indigent, and the trial judge's unjustifiable finding that the defendant waived his right to counsel, constitute a denial of the defendant's right to counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts

Declaration of Rights, requiring automatic reversal of his convictions?

STATEMENT OF THE CASE

Prior Proceedings[1]

On October 10, 2001, a Middlesex County grand jury returned indictments alleging that on or about May 21, 2001, the defendant, Vincent Godwin, with intent to injure or defraud, did falsely make or forge an order for money, two wit: a check made payable to Ms. Louis Adriana Godwin for $98,000 [2001-1177-001]; that on or about May 21, 2001, Vincent Godwin, with intent to injure or defraud, did falsely make or forge an order for money, two wit: a check made payable to Ms. Loise A. Godwin for $175,000 [002]; that on or about May 21, 2001, Vincent Godwin, with intent to injure or defraud, did utter and publish as true a false or forged instrument, to wit: a check made payable to Ms. Louis Godwin for $98,000 well knowing the same to be false or forged [003]; that on or about June 18, 2001, Vincent Godwin, with intent to injure or defraud, did utter and publish as true a false or forged instrument, to wit: a check made payable to Loise A. Godwin for $175,000 well

---

[1]

The Record Appendix shall be cited herein as (R.A. ); citations to the trial transcript will be cited herein by transcript volume and page, e.g., (1/10), with the exception that the transcript for November 14, 2001 shall be cited by date and page, e.g., (Nov.14/10).

knowing the same to be false or forged [004]; that on or about June 4, 2001, Vincent Godwin did steal the property of Framingham Cooperative Bank said property having a value exceeding two hundred and fifty dollars: to wit $70,000 [005]; that on or about June 4, 2001, Vincent Godwin did steal the property of Framingham Cooperative Bank said property having a value exceeding two hundred and fifty dollars: to wit $10,500 [006]; that on or about divers dates between June 5, 2001 and June 13, 2001, Vincent Godwin did steal the property of Framingham Cooperative Bank said property having a value exceeding two hundred and fifty dollars: to wit $1,200 [007]; that on or about divers dates between June 5, 2001 and June 13, 2001, Vincent Godwin did steal the property of Framingham Cooperative Bank said property having a value exceeding two hundred and fifty dollars: to wit $7,400 [008]; that on or about divers dates between June 5, 2001 and June 13, 2001, Vincent Godwin did steal the property of Framingham Cooperative Bank said property having a value exceeding two hundred and fifty dollars: to wit $2,500 [009]; that on or about divers dates between June 5, 2001 and June 13, 2001, Vincent Godwin did steal the property of Framingham Cooperative Bank said property having a value exceeding two hundred and fifty dollars: to wit $4,000 [0010]; and that on or about June 4, 2001,

3

Vincent Godwin did steal the property of Framingham Cooperative Bank said property having a value exceeding two hundred and fifty dollars: to wit $150,000 [0011]. (R.A. 7-17).

On February 26, 2002 after a trial before Justice Susan E. Garsh, a jury acquitted Mr. Godwin of the forgery and uttering offenses [001-004], and convicted him of the seven larceny offenses [005-011]. (3/174-178). Mr. Godwin filed a timely notice of appeal from his convictions on March 18, 2002 (R.A. 37).

On March 21, 2002, Justice Garsh sentenced Mr. Godwin to six concurrent sentences of 18 months in the House of Correction on indictments 005-010, and two years unsupervised probation on indictment 011, from and after the six concurrent sentences. (4/19). On the same date, Justice Garsh allowed Mr. Godwin's Motion for Stay of Execution of Sentence Pending Appeal on the ground that Mr. Godwin had raised a meritorious issue as to whether he was deprived of his right to court-appointed counsel. (R.A. 5, 33; 4/38).

The case was entered on the docket of the Appeals Court on August 5, 2002. After entry of the case on the docket of the Appeals Court, Justice Garsh allowed Mr. Godwin's Motion to Expedite the transcript of a November 14, 2001 hearing (at which Justice Charles J. Hely determined that Mr. Godwin was indigent and not

4

entitled to court-appointed counsel), and the Appeals Court stayed the appeal pending receipt of the transcript. (R.A. 39-40). On October 9, 2002, the stay was vacated after receipt of the November 14, 2001 transcript. (R.A. 40).

Statement of the Facts

The defendant, Vincent Godwin, moved to Massachusetts from Virginia in 1999 along with his wife, Lois, and their three children. (3/63-64). Mr. and Mrs. Godwin, who had been married for about eight and one-half years, had only one bank account in Massachusetts - at Framingham Cooperative Bank (hereinafter "FCB") - which was in Mrs. Godwin's name only, as Mr. Godwin was not working. (3/65-66, 71). Mrs. Godwin, a legal assistant and a pharmacy technician, was the sole supporter of the family. (3/66).

On May 5, 2001, the Godwins added Mr. Godwin's name to Mrs. Godwin's account at FCB (hereinafter, "the account"). (2/115, 117). Just over two weeks later, on May 21, 2001, a $98,000 check was deposited into the account via the night depository. (118-121, 125). The check, from the Madison Area Education Special Services Unit of Madison, Indiana ("MAESSU"), was made payable to the order of Louis (not Lois) Adriana Godwin. (2/192). However, although the check looked like a

valid check from MAESSU, the corresponding check for that check's number – 35532 – that MAESSU issued was actually for a check written on December 8, 2000 to James Stanfield Co. in California for $438.99 – not to "Louis" Godwin for $98,000. (3/47-50, 53). The James Stanfield Company never received its $438.99 check from MAESSU. (3/50). On close inspection, the check – which had issued from MAESSU's bank, Madison Bank and Trust (later named National City Trust) had been altered in several ways. (2/129, 179).

Mrs. Godwin, who did not sign the check, had no idea that such a large amount of money had been deposited into the account. (3/67-70). Indeed, prior to this deposit, the account balance was $1167.98, and the average balance of the account for some time had been between $1,000-$2,000. (2/124). As the check had been endorsed on the back "deposit only," the funds from this check were deposited into the Godwin's account at FCB, the check made its way through the Federal Reserve System, and then made its way to the bank that it was ultimately drawn on – Madison Bank and Trust of Indiana. (2/130-134). The check "was paid there" – at Madison Bank and Trust in Indiana. (2/27175). Madison Bank and Trust later tried to return the check to FCB, but by that time FCB had "paid out" the funds. (2/135).

On June 4, 2001, Mr. Godwin requested that $70,000 from the Godwin's account be wired to K-R LTD. of New York. (2/137, 176, 236-238). Also on June 4, 2001, Mr. Godwin wrote a check in the amount of $10,500 payable to himself. (2/139-144). This check was cashed. (2/140). In addition, from June 5 to June 12, Mr. Godwin wrote checks on the account in the amount of $7,400 (to himself); $1,200 (to Carol Davis); and $2,500 (to himself). (2/154-155). Bank photographs make clear that it was indeed Mr. Godwin who wrote these checks. (2/156-158). Similarly, bank photographs and other documentation revealed that Mr. Godwin went to FCB on June 14, 2001 and wrote a check in the amount of $4,000 (made payable to the bank), and in return obtained a $4,000 treasurer's check made payable to Goldstein, Swank and Gordon. (159-164).

On June 18, 2001, FCB received a second deposit destined for the Godwin's account via the night depository that consisted of a check made payable to "Louise A. Godwin," in the amount of $175,000, as well as a deposit slip containing the name "Lois Godwin." (2/166, 210). Once again, Mrs. Godwin did not sign the check, and indeed had no idea that such a large amount of money had been deposited into the account. (3/67-70).

7

The $175,000 check was written on an account from
SunTrust Bank of Atlanta, Georgia, belonging to
Spellman College. (2/167-168; 3/33-37). However,
although the check did reflect Spellman College's
correct SunTrust Bank account number, it was not a
valid Spellman College check, as Spellman College had
never written a check to a "Louise A. Godwin," or to
Lois or Vincent Godwin for that matter. (3/24-37).
The funds from that check were deposited into the
account at FCB and the check made its way through the
Federal Reserve System to SunTrust Bank. (2/169-170,
176).

On June 21, 2001, Mr. Godwin wrote a check from
the account in the amount of $150,010, presented it to
FCB, and in return (for a $10 fee), FCB fulfilled Mr.
Godwin's request for a wire transfer in the amount of
$150,000 to K-R LTD. (2/170-176). However, at some
point shortly after June 21, 2001, FCB froze the
account due to the size of the checks and the fact that
they were being returned by Madison Bank and Trust and
SunTrust Bank. (2/182, 212).

At some point soon after he learned that the
account had been frozen, Mr. Godwin went to FCB to
speak with Joseph Vincent, FCB's controller and
security officer, to find out what was wrong with the
account. (2/213-214). Mr. Vincent was unavailable

8

that day, but a few days later Mr. Vincent arranged a meeting at his office with Mr. and Mrs. Godwin. (2/181, 213-214).  At this meeting, Mr. Vincent advised Mr. and Mrs. Godwin that the checks had been returned, and asked if they were going to be replaced.  (2/181). Mr. Godwin, who told him that the checks would be replaced, said that if FCB had just called him about the checks he could have cleared up any misunderstanding.  (2/181).  Mr. Vincent told Mr. and Mrs. Godwin that, after reviewing the account, and based on the bank's investigation, FCB actually owed Mr. and Mrs. Godwin money.  (2/219).  Mr. Vincent explained to the Godwins that the account would be reopened and that approximately $1,000 would be credited to the account.  (2/219-220).

Mr. Godwin readily admitted to Mr. Vincent that he had been expecting a large amount of money to be deposited into the account, but the fact that the large deposits were made by someone other than Mr. Godwin never came up.  (2/223-224).  Mr. Vincent did not show Mr. Godwin or his wife the two deposited checks from MAESSU and Spellman College, and never explained to Mr. Godwin that the money had been deposited via the night depository, not via wire transfer, as Mr. Godwin had been expecting.  (2/229; 3/5).  The meeting then ended "with the usual pleasantries," and as Mr. Vincent had

9

promised, the account was reopened soon thereafter. (2/181, 220-221). In fact, as it appeared that the "misunderstanding" had been cleared up, Mr. Godwin subsequently wrote a few checks on the account without further incident. (2/181, 220-221).

Nevertheless, Mr. Godwin was arrested on July 7, 2001. (3/13-14). By the arresting officer's admission, he was extremely cooperative, and explained that he had been speaking with Mr. Vincent at the bank and thought he had cleared up any misunderstanding. (3/13-16). When he was later questioned by the police, Mr. Godwin again explained that the whole thing was a misunderstanding - indeed, even the arresting officer noted his surprise when the police told him that there was a problem with "the checks." (2/239; 3/4). Mr. Godwin explained to the police that he had never seen the two large checks that had been deposited in his account, and that he had thought that the large deposits he had been expecting were going to be made via a wire transfer - not by having checks dropped into the night deposit. (3/5, 7).

Mr. Godwin then explained that the money was from a good Samaritan who was helping him regain money he had lost in an oil investment deal three years earlier. (3/6). He explained to the police that the $150,000 wire transfer he made to Nigeria was part of the deal

he made with the good Samaritan — he had been told that he had to do certain acts - such as send gifts to the people in Nigeria - in order to show good faith, and in return he would receive help in regaining the money he had lost a few years earlier in a Nigerian oil investment. (3/6). Mr. Godwin explained that sending such gifts was a common business practice in Nigeria, and explained that was why he also sent the Rolex watch that he bought with the $4,000 check he wrote to Goldstein, Swank and Gordon - a jewelry store in Marlborough — to Nigeria. (2/236-240; 3/7). He did not tell the police who the good Samaritan was; rather, he explained that "they were to remain unnamed." (3/7). He said that "God would get him through this" ordeal. (3/7).

National City Bank (successor to Madison City Bank) later filed a claim against FCB and tried to return the $98,000 check, but FCB refused it since FCB was "later advised that because the check was not returned within twenty-four hours the loss was not [FCB's]" loss. (2/179, 186). As to the June 17, 2001 check, it was returned to FCB by SunTrust in Atlanta (which never paid the check), so the wired funds that Mr. Godwin had tried to wire to Nigeria were returned to FCB as well. (2/180, 188).

11

ARGUMENT

I. WHERE THE RECORD REVEALS THAT MR. GODWIN WAS INDIGENT, AUTOMATIC REVERSAL OF HIS CONVICTIONS IS REQUIRED AS THE HEARING JUDGE'S UNSUPPORTED DETERMINATION THAT HE WAS NOT INDIGENT, AND THE TRIAL JUDGE'S UNJUSTIFIABLE FINDING THAT HE WAIVED HIS RIGHT TO COUNSEL, WERE CLEARLY ERRONEOUS AND ABUSES OF DISCRETION, AND AS SUCH VIOLATED MR. GODWIN'S CONSTITUTIONAL RIGHT TO COUNSEL.

The Sixth and Fourteenth Amendments to the United States Constitution afford a defendant the right to assistance of counsel in all state criminal prosecutions which may result in the loss of his liberty. See Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.E.2d 530 (1972); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.E.2d 799 (1963). See also Commonwealth v. Delorey, 369 Mass. 323, 326 (1975). This right is further protected by art.12 of the Declaration of Rights of the Massachusetts Constitution and by S.J.C. Rule 3:10. Commonwealth v. Babb, 416 Mass. 732, 735 (1994).

The Constitutional right to counsel requires that Courts make available, to an indigent defendant, counsel with whom reasonable communication is possible, who is competent, completely loyal and, with the defendant's cooperation, is prepared to defend him. Commonwealth v. Lee, 394 Mass. 209, 216 (1985). This fundamental right is so jealously guarded that a failure of a trial judge to take reasonable steps to

12

protect it is not only error, it is conduct that has clearly not been tolerated in the courts of the Commonwealth. See Matter of Scott, 377 Mass. 364, 374 (1979) (Committee on Judicial Responsibility made recommendation that judge be subjected to discipline for misconduct, including one instance where judge did not appoint counsel on the grounds that since the defendant had posted bail, he was not indigent, despite fact that defendant was a student and his mother was on welfare). In fact, a denial of a defendant's Constitutional right to counsel has been deemed a "unique constitutional defect rising to the level of a jurisdictional defect." See Lackawanna County Dist. Attorney v. Coss, 532 U.S. 394, 395, 121 S.Ct. 1567, 149 L.Ed.2d 608 (2001) (failure to appoint counsel for an indigent deemed jurisdictional defect). See also Commonwealth v. Cavanaugh, 371 Mass. 46, 57 (1976) (where trial judge forced defendant to choose between proceeding with unprepared counsel or proceeding pro se, defendant's "Sixth Amendment right to counsel was violated and the convictions must be reversed").

In this case, there is no basis in law or in fact for Justice Hely's determination that Mr. Godwin was not indigent, or for Justice Garsh's finding that Mr. Godwin had waived his right to counsel. Compare Commonwealth v. Delorey, 369 Mass. at 326 (judge heard

13

the defendant and received information from a probation officer on the defendant's ability to pay for counsel, and issued written findings supporting his determination that that the defendant was able to pay for counsel). Rather, the record clearly demonstrates that Mr. Godwin was indigent, as determined by the Probation Department and, even more importantly, as determined once previously by Justice Hely himself, and, after trial, by Justice R. Malcolm Graham. The record also clearly demonstrates that, far from waiving his right to counsel, Mr. Godwin made clear to Justice Garsh, on the record, that he did not want to proceed pro se, and that he was not waiving his right to counsel.

On November 6, 2001, Justice Hely approved Mr. Godwin's affidavit of indigency on the grounds that Mr. Godwin "has an annual income, after taxes, one hundred twenty-five percent or less of the current poverty threshold referred to in G.L. c. 261, § 27(A)(b)." (R.A. 18, 20). Accordingly, on the same date, attorney James J. Brady was appointed to represent Mr. Godwin, causing Attorney Brady to file his Notice of Appearance. (R.A. 19, 21). However, just eight days later, on November 14, 2001, after a hearing (see transcript dated November 14, 2001), Justice Hely reversed his prior finding of indigency, and instead

found that Mr. Godwin was not indigent and, therefore, not entitled to appointed counsel. (Nov.14/13-14).

The November 14 hearing was scheduled as a pretrial conference, at which Attorney Brady was to represent Mr. Godwin. (Nov.14/2-6). However, Attorney Brady was unable to attend on that date, and therefore requested, through the Assistant District Attorney, a continuance until December 4, 2001. (Nov.14/6). Mr. Godwin, not wanting to delay proceedings unnecessarily, suggested that, although he was indigent, he was also an attorney, and therefore he would be willing to go forward with the pretrial conference without Attorney Brady. (Nov.14/8). The magistrate decided that the issue would be addressed by the judge at the second call. (Nov.14/8).

At the second call, Justice Hely was informed that Attorney Brady had requested a continuance to December 4, 2001. (Nov.14/10). When Justice Hely asked Mr. Godwin if he was planning to represent himself, Mr. Godwin explained that he had not made that decision yet. (Nov.14/11). Justice Hely stated that as Mr. Godwin was a well-educated man, he was not sure if Mr. Godwin was entitled to court-appointed counsel, as Justice Hely was "not so sure that you qualify as 'indigent.'" (Nov.14/11). Mr. Godwin responded that he was concerned that only "a fool represents himself,"

15

and was therefore inclined, at the very least, to proceed with the assistance of "co-counsel." (Nov.14/12).

Justice Hely made clear that Mr. Godwin was not entitled to appointed counsel unless he were deemed indigent, and asked Mr. Godwin to explain why he qualified as indigent. (Nov.14/13). Mr. Godwin explained:

> Well, your Honor, I, I will say this.
>
> I know my status. And, like, being in this situation here, in Massachusetts, and away from my home in Virginia, I don't have anything here. But that doesn't mean that I am not prepared to go forward with this case domicile.

(Nov.14/13). Justice Hely immediately responded (despite the Probation Department's prior finding of indigency and the November 6, 2001 finding of indigency by Justice Hely's himself):

> Okay.
>
> Well, the Court finds the Defendant not indigent.
>
> Mr. Brady will not be the counsel. If you want to hire a lawyer, you are free to do so. If you choose not, that is your right also, under common laws of the United States and the State of Massachusetts.

(Nov.14/13-14). The hearing adjourned with Justice Hely's admonition to Mr. Godwin, "[w]e will see you December 10, with or without a lawyer." (Nov.14/17). The clerk's minutes reveal that the "court declares

[defendant] Not Indigent and not entitled to Court appointed counsel." (R.A. 22).

On February 20, 2002, at a pre-trial status hearing just days before trial, Justice Garsh, noting that there was no indication in the record that Mr. Godwin had received a colloquy with respect to his "going pro se," held a colloquy concerning Mr. Godwin's "going pro se." (1/4). Mr. Godwin responded to Justice Garsh's questions by explaining that he was a forty-four year old graduate of Dickinson School of Law, and had practiced as an attorney in Virginia from 1991 through 2000, including significant criminal defense work and jury trials. (1/6). After Justice Garsh assured herself that Mr. Godwin understood the charges against him, the maximum sentences, and the Commonwealth's burden to prove all of the elements of the offenses charged, she asked Mr. Godwin if he was aware that he had the right to the assistance of appointed counsel - if he was entitled to it due to his financial status. (1/16).

Mr. Godwin informed Justice Garsh that when he first came to court he was appointed counsel, but then Justice Hely, after asking him some questions, determined that he was not indigent. (1/16). Mr. Godwin then explained:

> I was under the impression that I would be appointed counsel. And I only asked the Court if I

17

could assist just by way of preparing the defense but the Court indicated that I was - because I was an attorney that I could not have counsel as I was able to afford it myself.

And I wanted to for the record object to that because I told the Court that I did not have funds to get an attorney, and I didn't think it was a fair trial that I'm going pro se but it's not willingly that I'm doing this pro se.

(1/16).  When Justice Garsh pointed out that Justice Hely made a finding that he was not indigent, Mr. Godwin explained, "[w]ell, the Court asked me what properties I have and I said I have nothing."  (1/17).

Justice Garsh next determined that Mr. Godwin generally understood the various mechanics of the trial that was scheduled to begin in just a few days.  (1/18-23).  Justice Garsh then asked if anyone had forced him to represent himself, to which Mr. Godwin responded, "I believe so, your Honor. . . . Well, the determination that I'm not indigent has forced me to represent myself."  (1/123).  Next, after he was asked if he understood that he could pay for standby counsel, the following took place:

> MR. GODWIN:    I'm, aware of that but my question, what would be the cost, would that be determined by the attorney or—
>
> THE COURT:    Determined by the attorney.
>
> MR. GODWIN:    Yes.
>
> THE COURT:    The Court having found you not indigent, Justice Hely of this Court, do you still wish to act as your counsel and not to engage counsel?

MR. GODWIN:      Your Honor, I believe that I need counsel but I don't have funds and I don't know — and so, I believe that I — all I can do is to go forward.

THE COURT:      Thank you. You may step down.

(VINCENT GODWIN STANDS DOWN.)

THE COURT:      I find the defendant is not presently under the influence of drugs or alcohol and is not presently suffering from any mental illness or disease.

I find the defendant possesses the intelligence and capacity to appreciate the consequences of his decision. I find the defendant understands and is knowingly, voluntarily and intelligently waiving his right to counsel and foregoing the benefits of counsel, this Court having found on November 14, 2001 that the defendant is not indigent and not entitled to Court-appointed counsel.

(1/24-25).[2]

---

[2] It is quite likely that Justice Garsh understood that Mr. Godwin wanted and felt that he was entitled to court-appointed counsel, and that her finding that he had waived his right to counsel was based on her belief that she could not overrule Justice Hely's determination that Mr. Godwin was not indigent, thus she felt constrained to find a "waiver" of counsel by virtue of the fact that Mr. Godwin had not retained his own counsel paid for with his own funds. However, where Justice Garsh's reasoning is not clear, and in any case where in these circumstances she could have — and should have — made her own determination as to his financial status, Mr. Godwin will not assume this to be the case, and out of an abundance of caution will treat Justice Garsh's finding as a finding of waiver of his right to court-appointed counsel, as well as a waiver of his right to retain and pay for counsel with his own funds.

After a trial before Justice Garsh, on February 26, 2002, on the same day that a jury acquitted Mr. Godwin of the forgery and uttering offenses [001-004], and convicted him of the seven larceny offenses [005-011], Justice Garsh ordered a pre-sentence report from the Probation Department. (3/181). On March 18, 2001, Mr. Godwin filed a Pro Se Motion for Appointment of Counsel on Appeal. (R.A. 23). He also completed and filed an Affidavit of Indigency and Request for Waiver, Substitution or State Payment of Fees and Costs, and a Supplement to the Affidavit of Indigency. (R.A. 24-27). These forms made clear that Mr. Godwin had no income and no assets (although they do indicate that he had a $5,000 income in the preceding year), and also demonstrated that he was $200,000 in debt. (R.A. 24-27). Mr. Godwin also represented that he was "unable to pay the fees and costs of the proceeding in which he is involved, or is unable to do so without depriving himself or his dependents of the necessities of life, including food, shelter and clothing. (R.A. 24).

On March 21, 2002, after Justice Garsh sentenced Mr. Godwin, she conducted a hearing on his Motion to Stay Execution of Sentence Pending Appeal. (4/19-34). Justice Garsh allowed the motion, finding on the record that although at the pre-trial colloquy Mr. Godwin did not want to proceed pro se, she required him to do so

20

based "entirely" on the finding of Justice Hely that Mr. Godwin was not indigent. (4/34).

After her ruling, Justice Garsh ordered Mr. Godwin to proceed directly to probation to conduct an interview. (3/43, 46). Accordingly, later that day the Probation Department completed a "Pretrial Intake/Indigency Report," which concluded that Mr. Godwin was "indigent because annual income, after taxes, is 125% or less of the current poverty threshold referred to in G.L. c. 261, § 27A(b)." (R.A. 28-30). This report revealed that Mr. Godwin was unemployed, and listed his employment for the last year as "cut grass, shovels driveways, in the town of Ashland." (R.A. 28). The Probation Department's report also revealed that Mr. Godwin was then living with his aunt in Fitchburg, and that he had no monthly income and had no assets. (R.A. 28-29). Accordingly, the Middlesex Probation Department found Mr. Godwin "INDIGENT" on the grounds that he "has available funds that are insufficient to contribute any amount toward the anticipated cost of counsel." (R.A. 30).

Also on March 21, 2002, Justice Garsh provided her written findings on Mr. Godwin's Motion for Stay of Execution of Sentence Pending Appeal. (R.A. 5, 33). In her written decision, Justice Garsh found the following:

21

> After review and hearing, motion to stay is
> ALLOWED. The defendant has raised a significant
> issue as to whether he was deprived of his right
> to court-appointed counsel. This court required
> the defendant to proceed pro se based upon the
> ruling of the court. (Hely, J.) that "after
> hearing, the Court finds defendant not to be
> indigent and not entitled to court appointed
> counsel." (November 14, 2001). No changed
> circumstances were alleged to have occurred from
> the date of that ruling to the date of the trial,
> but the defendant maintained that the ruling was
> wrong. There are no findings (unless they were
> made orally) supporting the determination of lack
> of indigency. On November 6, 2001, eight days
> before finding the defendant not indigent, the
> court (Hely, J.) had found him to be indigent. A
> reasonable likelihood of success on appears at
> this time that the defendant was deprived of his
> right to counsel since there is no explanation for
> the court's second determination and the defendant
> states that his asset situation did not change
> between November 6, 2001 and November 14, 2001 . .
> . .

(R.A. 5, 33). Justice Garsh decided to take no action

on Mr. Godwin's motion seeking appointment of appellate

counsel, stating instead that that the matter was to be

taken up by the first session after it determined

whether or not Mr. Godwin was indigent or not indigent.

(R.A. 5).

On June 11, 2002, Justice R. Malcolm Graham

ordered that Mr. Godwin be interviewed by the Probation

Department, and ordered that if he was deemed indigent

by probation, the matter should be forwarded to CPCS

for screening counsel. (R.A. 6, 23). On July 12,

2001, a Notice of Appointment of Counsel form was sent

to CPCS for appointment of counsel for appeal. (R.A.

36).  The undersigned attorney for Mr. Godwin is, in fact, appointed CPCS counsel.  (R.A. 38).

As this record reveals, there can be no genuine dispute that, despite Justice Hely's determination that Mr. Godwin was indigent (Nov.14/13-14), and Justice Garsh's pre-trial determination that Mr. Godwin "knowingly, voluntarily and intelligently [waived] his right to counsel and [decided to forego] the benefits of counsel" (1/24-25), Mr. Godwin was, in fact, indigent, and that far from waiving his right to counsel, he informed Justice Garsh that he wanted counsel, felt he needed counsel, and felt that he was being forced to proceed without counsel.  On this record, there can be no question that Justices Hely and Garsh deprived Mr. Godwin of his constitutional right to counsel.  See, e.g., People v. Valdery, 354 N.E.2d 7, 204 (Ill.App. 3 Dist. 1976) (reversing conviction where trial court abused discretion in refusing to find defendant was indigent and to appoint an attorney for him on ground that defendant had been able to raise $3,500 to post bail); Brewer v. State, 533 P.2d 645, 646-647 (Okla.Crim.App. 1975) (in view of record that sole source of income for 73-year-old defendant was his social security check of $85.20 a month plus small amounts made as a small-time gambler and that defendant was found to be indigent for purpose of right to

23

appointed counsel in federal court, it was abuse of discretion to refuse appointment of counsel); People v. Griffin, 177 N.W.2d 213, 216 (Mich.App. 1970) (where accused's wife had been given house and all furniture "free and clear" of any claim of the accused as part of a property settlement, and in view of inability of accused to earn money as result of being in custody, finding that accused was not an indigent was abuse of discretion).  Contrast Adams v. City of Pelham, 651 So.2d 55, 55 (Ala.Cr.App. 1994) (finding that defendant was not indigent and thus not entitled to appointed counsel was supported by affidavit in which defendant stated that he had take home pay of $1,200 per month, monthly expenses of $819, and two automobiles worth $3,000).

Indeed, the entire record completely contradicts the findings of both judges.  Justice Hely's determination that Mr. Godwin was indigent is refuted by each and every of the many affidavits and other forms that Mr. Godwin and the Probation Department completed and filed.  These documents clearly set forth the facts that Mr. Godwin had essentially no income, had no assets, and had liabilities totaling approximately $200,000.  Furthermore, as set forth below, the evidence adduced during trial, as well as

24

other representations made in-court, corroborate Mr.
Godwin's representations.

The reason Mr. Godwin brought his family to
Massachusetts in 1999 was that he lost his home in
Carrollton, Virginia. (1/30; 3/63-64). Since moving
to Massachusetts, Mr. Godwin had been unemployed.
(3/65-66, 71). Through July, 2001, Mrs. Godwin, a
legal assistant and a pharmacy technician, had been the
sole supporter of the family, and was only able to
manage to maintain an average balance of between one to
two thousand dollars in her bank account.[3] (2/124).
At the time of his arrest, Mr. Godwin had explained to
the police that three years earlier he had lost a great
deal of money in an oil investment deal. (3/6; 4/10).
In fact, by the time of trial, he had no home or even
an apartment of his own, and thus was forced to live
with an aunt in Fitchburg who let him sleep on her
sofa. (R.A. 28; 4/20-22, 43).

Where all of the evidence in the record leads to
the same conclusion – that Mr. Godwin was indigent –
Justice Hely's completely unsupported decision to the
contrary must be said to be clearly erroneous and an
abuse of discretion. That is particularly so where

---

[3] By the time of trial, Mr. Godwin was living with an
aunt in Fitchburg while his wife was living in Ashland
with her sister. (R.A. 28; 4/20-24)

both before and after his trial, two justices of the
Middlesex Superior Court (including Justice Hely
himself) found Mr. Godwin to be indigent. See Warren
v. City of Enterprise, 641 So.2d 1312, 1315
(Ala.Cr.App. 1994) (constitutional right to appointed
counsel was denied where, within one month of refusing
to appoint counsel under theory that defendant was
financially able to retain counsel, same trial judge
found defendant to be indigent for purposes of
appointing appellate counsel based on essentially same
information, and thus, trial court's inquiry into
indigency of defendant was insufficient). It is also
abundantly clear in light of the fact that there is no
reference in the record to Justice Hely making any
effort whatsoever to establish a factual basis for his
determination that Mr. Godwin was not indigent. At the
November 14, 2001 hearing Justice Hely apparently did
not so much as even glance at the many forms filed by
the defendant and the Probation Department concerning
Mr. Godwin's financial status, and instead apparently
based his decision entirely (and improperly) on the
fact that Mr. Godwin had a year earlier been a
practicing attorney in Virginia. See, e.g., Orem City
v. Bergstrom, 992 P.2d 991, 994-995 (Utah App. 1999)
(trial court, by considering only defendant's age and
his employment status when determining he was not

26

indigent, improperly denied defendant's request for court-appointed counsel).

Justice Garsh's February 20, 2002 finding that Mr. Godwin had "knowingly, voluntarily and intelligently [waived] his right to counsel and [decided to forego] the benefits of counsel" (1/24-25) is similarly impossible to justify. At the February 20, 2002 pre-trial status hearing just days before trial, Mr. Godwin made clear to Justice Garsh that he was under the impression that he would have appointed counsel (1/17); that he had told Justice Hely that he did not have funds to get an attorney (1/17); that he told Justice Hely that he did not think it would be fair to make him proceed pros se (1/17); that he was not willingly proceeding pro se (1/17); that he owned no property (1/17); that he believed that the determination that he was not indigent was forcing him to proceed pro se against his wishes (1/23); and that he needed counsel but he did not have the funds to pay for counsel (1/24-25). If anything, Justice Garsh's colloquy clearly proves that Mr. Godwin did <u>anything but</u> "knowingly, voluntarily and intelligently [waive] his right to counsel and [decide to forego] the benefits of counsel." The colloquy also makes clear that Justice Garsh did not heed the familiar warning that "when the question of a possible waiver of counsel is raised,

27

'courts indulge every reasonable presumption against waiver of fundamental constitutional rights and . . . (they) do not presume acquiescence in the loss of fundamental rights.'" Commonwealth v. Cavanaugh, 371 Mass. at 57, quoting Johnson v. Zerbst, 304 U.S. 458, 462, 58 S.Ct. 1017, 82 L.E.2d 1461 (1931). See also Orem City v. Bergstrom, 992 P.2d at 994 (fundamental right to counsel deserves all practical safeguards to protect it, and it is prudent to err on the side of caution).

Furthermore, it is worth noting that there is no reason to believe that Mr. Godwin's repeated requests for appointed counsel were made for some improper reason, such as to postpone his trial. Indeed, on November 14, when Attorney Brady did not appear, rather than request a continuance, Mr. Godwin requested that he be permitted to handle the pretrial conference himself in order to expedite the matter. (Nov.14/8). In fact, the prosecutor himself stated, on the record after trial, that Mr. Godwin had "been outspoken in his desire to have a quick trial date." (3/180). Thus, there can be no claim that Mr. Godwin's desire for appointed counsel was made in anything but good faith. Contrast Commonwealth v. Flowers, 5 Mass. App. Ct. 557, 564-565 (1977) (deeming last minute change in counsel "a dilatory tactic").

In the circumstances of this case, there can be no question that Mr. Godwin was denied his constitutional right to counsel. Thus, it necessarily follows that Mr. Godwin's convictions must be reversed. See Satterwhite v. Texas, 486 U.S. 249, 256-257, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284, 290 (1988) (automatic reversal required for Sixth Amendment violations that pervade entire proceeding), cited in Commonwealth v. Curtis, 417 Mass. 619, 634 (1994). See also Commonwealth v. Cavanaugh, 371 Mass. at 57 n.7 (denial of Sixth Amendment Right to Counsel precludes harmless error argument).

## CONCLUSION

For all of the foregoing reasons, the defendant, Vincent Godwin, respectfully requests that this Court reverse his convictions and grant him a new trial.

Respectfully, submitted,
Vincent Godwin,
by his attorney,


Thomas C. Foley
Attorney at Law
P. O. Box 2187
South Hamilton, MA 01987
(978) 239-7003
BBO No. 631661

29

## RECORD APPENDIX

1.   Docket entries                                          1

2.   Indictments                                             7

3.   Justice's Determination/Indigency                      18

4.   Notice of Assignment of Counsel                        19

5.   Statement of Appointment                               20

6.   Notice of Appearance                                   21

7.   Clerk's Minutes                                         22

8.   Motion for Appointment of Counsel on Appeal            23

9.   Affidavit of Indigency and Request for
     Waiver, Substitution or State Payment
     of Fees and Costs                                       24

10.  Supplement to the Affidavit of Indigency               26

11.  Partial Intake/Indigency Report                        28

12.  Justice's Determination/Indigency                      30

13.  Affidavit for Motion to Stay
     Execution Pending Appeal                                31

14.  Motion for Stay of Execution of Sentence               33

15.  Affidavit for Motion to Stay
     Execution of Sentence                                   34

16.  Notice of Assignment of Counsel                        36

17.  Notice of Appeal                                        37

18.  Notice of Assignment of Counsel                        38

19.  Clerk's Notice regarding Motion to
     Expedite Transcript                                      39

20.  Notice of Docket Entry regarding vacation
     of Appeals Court's stay of Appeal                        40